[PHILADELPHIA, JANUARY 10, 1831.]

## The case of BARNET'S Appeal.

Rawle.
3r   15
190  480

Where a paper contains the substance of a will, with the usual act of execution subjoined, though without the names of subscribing witnesses, the fact that it has been thus found in the decedent's possession, ought, without actual publication, to be taken for *prima facie* evidence of its having been adopted as a testamentary act.

Where, on the other hand, it is destitute of every formal act of authentication, the presumption ought to be adverse, in the absence of proof of actual publication, or any other act of recognition equally satisfactory.

Where a paper was headed, "My last will and testament, &c." the face of which was blotted and blurred, and indicated the first essay of a mind untrained to method and arrangement, in which whole sentences were obliterated, and entire passages cut off, crossed out, and repeated with material variations, in addition to which the decedent began anew on a fresh leaf, to make, not a fair copy of what preceded it, but an entirely new draft varying from it in essential particulars, and this was left unfinished, it was *held* that it contained no sufficient intrinsic evidence of a testamentary intention, to entitle it to be admitted to probate as a will.

Though a rough draft may be a testament, where the intent is clearly apparent, yet it is otherwise if it appear that the decedent viewed it as a mere outline to be filled up and completed by more detailed provisions; or that having viewed it at one time as complete, he had cancelled it, and used it as a memorandum for a new disposition.

THIS was an appeal from the decision of the Circuit Court of Northampton County, held by Rogers, Justice, in March, 1830, reversing the decision of the Register's Court of that county, as respects their refusal to admit to probate, a paper writing dated the 7th of April, 1820, offered as the last will and testament of William Barnet, deceased.

William Barnet the elder, having died on the 7th of August, 1829, two papers were, on the 11th of the same month, presented to the Register of Northampton County for probate, as his last will and testament.

The first of these papers was as follows: viz.

"Easton, April 7th, 1820.

" My last will and testament, &c.

"I do appoint Thomas M'Keen and my son William, my executors, to perform all matters herein mentioned, that is to say, I give to my son George one dollar, and no more. I give my son Henry five hundred dollars, and no more. *I give to Sarah, the daughter of George Barnet, (currier) five hundred dollars, which is to be kept on interest, well secured, till she becomes to the age of twenty-one years, if she should so long live, if not*, the same to be divited equal among the following; William, Samuel, Elizabeth, Susan, Aaron, David and Edward. All my estate is to be divittet perfict equal amongst the last namet chiltorn, the depts in my book against Wm. and Samuel to be deducted."

The lines in italics had lines drawn through them with a pen.

Then came the following lines, which were crossed out with a pen, viz.

· (The case of Barnet's Appeal.)

" *My house and all the lot and tanyard, Tables, Burrows, curing knives, fleshers, worker, and in fact all the tools necessary to carry on the business. to be aprased by these men and them to be chosen by Thomas M'Keen, and whatever amount it may be, David and Edward are to have the refusal of the same. My household furniture, beding, book, &c. I shuld like very mutch if the last named children wold devide equel and farely amongst themselfs such of it as they may think proper to devide. I give to Wm. and Samuel my pistols, sword and epoulets, they devide as well as they see proper. I give to Edward my watch, if I own one at the time. I further appoint Thomas M'Keen a guardian for my minor childorn, That is to say, Aaron, David and Edward.*"

The same paper also contained the following words: viz.

" My house and all the lot it stands on, the Tanyard incluted, and all other buildings thereon, the Tanyard tools and currin Tools and Table, weal Barrows, currin knives, Fles workers, and in fact all the tools that's necessary to carey on the buisseness of tanning and curring, to be apraset by three men, and them to be chosen by Thomas M'Keen, David and Edward to have the refusal of the same.

" My household furniture, Beding, Books, and the Gig, pistols and sword, appelets, incluted, to be devided in seven lots, as equal as possible, and valuation put on in proportion of each lot, then Wm. Saml. Elizah. Susan, Aaron, David and Edward to draw lots for the same. The leather on hand is to be tanned out and sold to the best advantage, one thirt of the proceets is to be returnet to my executors. My teen acor lot to be devited in three parts, and valuation put on them, the last named childer to make choise."

The other paper was as follows : viz.

" This my last will and Testament.

" I do apoint Thos. M'Kcen and my son David executors to perform all matters herein mentioned, that is to say, I give to my son George one dollar and no more. I give to my son Henry five hundred dollars and no more. My house and lot, Tanyard, and all other buildings thereon, the Grindstones, curring Kniefs, Fleshers, Tables, weal Barrows, in fact all the tools in the yard or about, of whatsoever description they may be, shall be *together as one lot, at the* rate of Five hundred dollars, David and Edward are to have it in part of there."                                                                    .

When these papers were presented to the Register, *John Barnet* and *Samuel Bittenbender* appeared before him and made affidavit that on the day of the decease of the above named *William Barnet*, and shortly after his death, at the request of *William Barnet junr.* and *David Barnet*, sons of the said deceased, they took his keys and proceeded to examine his papers, &c. That upon unlocking his secretary they found in it the two paper writings above referred to ; That they are well acquainted with his hand-writing, having fre-

(The case of Barnet's Appeal.)

quently seen him write, and that they believed both the said paper writings to be in his hand-writing: that they had been well acquainted with him for more than twenty years previous to his decease, and that from their first acquaintance with him up to the day of his death, he was of sound disposing mind, memory and understanding, according to the best of their knowledge, observation, and belief.

On the 12th *August,* 1829, letters testamentary were granted on the two papers, to *Thomas M'Keen* and *David Barnet*; *William Barnet,* who was named as executor in the first paper, having filed in the Register's office a paper in which he declared that he did not consider himself an executor, and that if he was, he wished that to be considered as his renunciation.

*George Barnet,* the eldest son of *William Barnet,* deceased, entered an appeal to the Register's Court from the decision of the Register admitting to probate the said two paper writings, as the last will and testament of the said *William Barnet,* deceased, and granting letters testamentary thereon.

Before the Register's Court, which was held on the 28th *November,* 1829, *John Barnet,* a witness called by the appellees, testified, among other things, that after returning from the funeral of the deceased to his late residence, *David Barnet, William Barnet, Samuel Bittenbender* and the witness went up stairs, when *David* and *William Barnet* brought out two small portable desks, and set them on the table: that they were unlocked in the presence of the persons above mentioned, and the two papers then exhibited, and which the witness identified, were found in one of the desks: that they examined only the two papers admitted to probate, and thinking it would be too much trouble to examine all the papers contained in the desks, they agreed to lock up all the papers in them and deposit them in the bank, which they did: that on the following Monday morning, on being requested to do so, they called at the bank, got the two papers in question, and took them to Mr. *Porter's* office, who drew the form of probate, which they took to the Register's office: that the witness had known the deceased, who was his uncle, upwards of thirty years: that both the papers were, in every part of them, in the hand-writing of the deceased, who, in the opinion of the witness, was from his earliest acquaintance with him, to the day of his death, of sound and disposing mind and memory. That after the decease of *Henry Barnet,* the son of the said *William Barnet,* deceased, *William,* junior, returned from Lancaster, and brought with him a copy of *Henry's* will, who had given every thing to his wife and her neice: that the witness asked the elder *William Barnet* whether he had ever intended letting *Henry* have any thing, to which he answered that he had, and that the last time *Henry* was in Easton he had asked him the question, and he had then told him he had intended to leave him, but made no mention of any amount, and then added, "All I had to do, is to alter mine:" that the witness was not confident

(The case of Barnet's Appeal.)

that he added the word " mine," and did not recollect his using the word " will."

On being cross-examined, the witness stated that the deceased was married three times. By his first wife he had three children, one of whom died young. *George*, the eldest, and *Henry*, the next, grew up. *George* was still living, and *Henry* died in Lancaster, without children. The second and third wives of the deceased, were sisters. By the second he had eight children. The eldest, a daughter, named *Catharine*, died young. The second, *William*, died after his father. The third, *Samuel*, died before his father. The fourth, *Eliza*, was still living, as was also the fifth, *Susan*. The sixth, *Aaron*, died before his father. The seventh, *David*, and the eighth, *Edward*, were still living. By the third wife he had no children. *Edward* had gone off a short time before his father's death; and it was understood in the family, though not then certainly known, that he had enlisted. It afterwards proved that he had.

The witness was further cross-examined, was re-examined and cross-examined a second time, but stated no facts which are deemed material, except those above stated.

The evidence of *Samuel Bittenbender*, another witness examined on the part of the appellees, was substantially the same as that of the preceding witness.

*Sarah Shaffer*, a witness also produced by the appellees, declared, that she lived in the family of *William Barnet* junr. and old Major *Barnet* boarded there : that about a year before the hearing, he was plaguing her about making a garden, when she told him he should leave her a lot, and then she could keep a garden as long as she lived ; to which he replied, his will was made. There was nothing either serious or joking in the matter.

*Isaac Levan* was also examined as a witness on the part of the appellees. His evidence in the material points corresponded with that of the first two witnesses, and he also stated some circumstances connected with the deceased having been left out of the direction of the Bank and the Bridge Company, from which he inferred, that the deceased at the time of his death, and for several years before, was not as well disposed towards Col. *M'Keen*, as he had previously been.

On the part of the appellant, *Philip H. Mattis*, Esqr. was produced as a witness, who testified, that he had been well acquainted with *William Barnet* the elder, deceased, within the last few years : that on several occasions he had heard him express himself in terms, which indicated any thing but friendship towards *Thomas M'Keen* Esqr. and he had expressed himself in terms of hostility, since he had been left out of the direction of the Easton Bank : that *George Barnet*, the son of the deceased, had a daughter : that he never heard the deceased express himself favourably or unfavourably with respect to his son *George* for some years past : that some six or eight years ago the deceased said he wished to consult the witness about drawing his will, intimating, though not expressly declaring, that it was on ac-

(The case of Barnet's Appeal.)

count of his son *George's* situation, that he wished to make a will: that this occurred about the time *George's* property was sold by the sheriff, and bought by the old man, though he could not be positive as to the time: that the deceased concluded by saying, he would draw up a rough sketch of his will some day, and show it to the witness, that he might put it in form. He said he wished his opinion on it, but never intimated to him what kind of arrangement he wished to make. Several years afterwards. he spoke again to the witness on the same subject, and to the same effect. The last conversation was about four or five years before his death. In the second conversation, he spoke of drawing up a rough sketch as a thing to be done, and the witness thought he stated that he had drawn up a rough draft before, but that it did not then suit him, and he wanted to alter it. The last conversation the witness was certain was subsequent to the sale of *George's* property by the sheriff. From the course of the first conversation, the witness inferred that he was not on good terms with his son *George*. In several conversations, the deceased appeared to express considerable interest in *Charles L. Eberle,* who married his son *George's* only child, and appeared anxious to obtain for him the situation of Deputy Register, and of Post Master, as successor of the witness, who it was expected would resign that office. The application in relation to the Post Office was in *November* or *December,* 1827.

The appellant then gave in evidence the records of the Court of Common Pleas of *Northampton* county, shewing that the *venditioni exponas,* under which the estate of *George Barnet* was sold, issued on the 12th *May,* 1821.

After full hearing and deliberation, the Register's Court reversed the decision of the Register, and decided that William Barnet died intestate; whereupon the persons named as executors in the alleged will appealed to the Circuit Court.

The Circuit Court reversed the decision of the Register's Court as respects their refusal to admit to probate the paper writing dated the 7th *April,* 1820, and decreed, that so much of said paper dated as aforesaid, as is not crossed and erased, is the last will and testament of the said *William Barnet,* deceased, and ordered it to be admitted to probate as such, and affirmed the remainder of the decision of the Register's Court, as to the paper without date, headed " This my last will and testament, &c."

From the decree of the Circuit Court, *George Barnet,* the eldest son of the deceased *William Barnet,* entered an appeal to the Supreme Court, for which he assigned the following reasons: viz.

*First.* The Circuit Court should have affirmed the entire decree of the Register's Court.

*Second.* There is no sufficient evidence of a testamentary intention connected with the said paper, dated *April* 7th, 1820, in the decree of the Circuit Court mentioned, to establish it or any part of it

as the last will and testament of *William Barnet* the elder, deceased, but there is sufficient evidence to the contrary.

*Third.* The said paper is an unexecuted and merely inchoate act or instrument, unsupported by evidence of publication as a will.

*Brooke* and *Jones* for the appellant.

*J. M. Porter* and *J. Sergeant* for the appellees,

The opinion of the Court was delivered by

GIBSON, C. J.—The few precedents in cases like the present to be found in the books, afford still fewer principles of general application, and individual cases must therefore stand in some degree on their peculiar circumstances. It seems that nothing has been settled as universally true, but that the *animus testandi* must have been present. But it is to ascertain its presence, that determinate principles to interpret the decedent's acts, are necessary. The certain, and, for the most part, equitable disposition of the law, ought not to be superceded but by a disposition of the decedent, manifested by acts which indicate his intention with reasonable and convenient certainty. Where the paper contains the substance of a will with the usual act of execution subjoined, although without the names of subscribing witnesses, the fact that it was thus found in the decedent's possession, ought, without actual publication, to be taken for *prima facie* evidence of its having been adopted as a testamentary act. Where, on the other hand, it is destitute of every formal act of authentication, the presumption ought to be adverse in the absence of proof of actual publication or any other act of recognition equally satisfactory. In substance, this distinction seems now to be adopted by the Judges of the English Ecclesiastical Courts, by whom the omission to perfect an instrument which carries with it intrinsic evidence of a design to superadd an act of authentication which the decedent has not been prevented from executing by sudden death, is referred to a change of intention; so that it is not every scrap of paper containing a disposition made in contemplation of death, that is received as testamentary. (1 *Roberts on Wills,* ch. 1. § 17.) The distinction is a wholsome one, for no prudent man would venture to put pen to paper in digesting any testamentary plan, if a rude sketch were received as evidence of what is usually the last, most solemn, deliberate, and perhaps important act of his life. It was on the principle I have indicated, that *Plumstead's Appeal* was determined. Two parcels of bonds and securities bearing on the envelope of each respectively the words "For *Rebecca Hutton,*" and "For the heirs of *George Plumstead,*" were found in a box which had been kept in the possession of the decedent till her death. No one doubted that these indorsements were memoranda of an intended testamentary disposition; but having neither shape nor feature of a testamentary act, they were not admitted to probate. (4 *Serg. & Rawle,* 545.) The case of *Arndtt* v. *Arndtt,* 1 *Serg. & Rawle,* 256, seems to be easily distinguishable. There the paper contained all the requisites of a will when it was exhibited as such to Mr. *Trail;* and an

after intention to correct it, so as to obviate discrepancies then pointed out, would not make it the less so in the meantime, inasmuch as actual cancellation, and not merely a purpose to cancel, amounts to a revocation (*Burns v. Burns,* 4 *Serg. & Rawle,* 295.) This is conclusively true in respect of a will formally executed; and it is not easy to say why it should not be so in respect of a will which, though destitute of the usual formalities, is nevertheless conceded to have been a will at the time.   That it was so, I am unable to doubt; for the delivery of a paper which contains the essential parts of a will, to a scrivener to put it into form, can no more invalidate it as a testamentary act, than could the delivery of a will already in due form, to be fairly copied.   It seems then that the defect in the argument of Mr. Justice YEATES, was in treating the intention to correct inconsistencies, as evidence that the paper never had been the decedent's will, when the intention was evidently only to revoke it *pro tanto.*   From expressions of the other judges, it might seem that the paper contained even the formal parts of a will; and the inference from these, is strengthened by the fact that no objection was made, that the evidence of publication which, in the absence of intrinsic evidence of actual adoption, would have been the life-giving circumstance, rested on the credibility of but one witness.   Notwithstanding the dissenting opinion of Mr. Justice YEATES, for whose judgment and experience we, in common with the profession, entertain great respect, I am unable to refuse an unqualified assent to the propriety of that decision. The case at bar seems to be essentially different.   Not only are the introductory words, " This is my will," coupled with an *et cetera* which indicates an intention subsequently to prefix a more full and formal expression, as evidence of the act of adoption, but the face of the paper is blotted and blurred just as we might expect to find the first essay of a mind untrained to method and arrangement.   Interlineation on interlineation is crowded into the spaces between the lines, till the manuscript is, in places, scarcely legible.   Whole sentences are obliterated, and entire passages cut off, crossed out, and repeated with material variations ; in addition to which, the decedent begins anew on a fresh leaf, to make, not a fair copy of what preceded it, but an entirely new draught, varying from it in essential particulars; and even this is left unfinished from an inability, no doubt, to arrive at a satisfactory conclusion.   The nature of this last attempt, may be inferred from its abandonment, which would hardly have ensued, had the object been a fair copy or even a more formal disposition according to a plan already matured; and that it was neither, is further apparent from the variance.   This remark would be inapplicable, were the second paper viewed as an attempt to revoke.   Yet were the first admitted to have been, at any time, a valid testamentary act, the cutting of it up into memoranda for an entirely new disposition, would be a revocation by actual cancellation.   I take it, then, that the paper contains no sufficient intrinsic evidence of a testamen-

(The case of Barnet's Appeal.)

tary intention; and this leads to a consideration of the evidence *dehors.*

On the part of the appellees, it was proved that the decedent, being told of the death of a son, intimated an intention to change the disposition of his property; but whether this was predicated of a disposition already evidenced by a testamentary act, or one only contemplated, does not sufficiently appear. Again, in reply to a female acquaintance who had jocularly hinted at a devise of one of his lots, he said his will was already made. This, however, seems to have been intended to parry the request; and it would be unsafe to adjudicate on the evidence of declarations in the course of a conversation that called for nothing like a serious expression of the fact. On the other hand, he had become inimical to one of the persons named in the alleged will as his executors. This, however, would tend to prove a change of purpose, rather than that he had not adopted the paper at all. But subsequent to the making of the writing, he told another witness that he would draw up a rough sketch of his will, and submit it to him to put it into form; that he wanted to have his *opinion* on it, but did not intimate what disposition he desired to make; and that in a conversation still later, he spoke of the rough sketch as remaining yet to be made, saying that he had drawn up a rough draught before, but that it did not suit him now. In this, it is evident, he alluded to the paper in controversy; and although even a rough draught may be a testament where the necessary intent is clearly apparent, yet the natural deduction from the evidence here, is that the decedent viewed it as a mere outline to be filled up and completed by more detailed provisions; or that having viewed it as at one time complete, he had cancelled it, and used it as memoranda for a new disposition, and this latter inference is powerfully corroborated by the intrinsic evidence of the paper itself. Nothing decisive, then, is proved by the extrinsic evidence, the tendency of which is only to strengthen the inference from the face of the paper. We are of opinion, therefore, that the writing has not been established as the testament of the decedent, and that it ought not to be admitted to probate.

Judgment of the Circuit Court reversed, and the judgment of the Register's Court affirmed.