## Murry *against* Murry.

A testamentary intention is to be inferred from every prospective disposition, where no particular expression, or apparent want of completion, indicates a suspension of it.

To give efficacy to a paper as a testamentary disposition, it must appear to be so far complete, as to have left no part of the testator's intention unexpressed.

ERROR to the common pleas of *Westmoreland* county.

James Murry and another against Satiah Murry.

This was a feigned issue, formed on a precept from the register, to determine whether a certain instrument of writing was, or was not, the last will and testament of Jeremiah Murry, Esq., lately deceased.

The writing is entirely in the handwriting of Jeremiah Murry, the decedent, and covers eight pages, which are regularly numbered by him, from one to eight, inclusive. It commences thus:

" In the name of God, amen. I, Jeremiah Murry, of the township of Franklin, county of Westmoreland, and commonwealth of Pennsylvania, being in perfect health, and of sound mind and

memory, but considering the uncertainty of life, do make, order and publish, this, my last will and testament, in the manner and form following, to wit:

Then follow various bequests to his wife, Satiah Murry, which form, as marked by him on the margin of the writing, the first item.

2d contains a devise of land, mills, and other estate, to his grandson, Jeremiah Murry.

3d contains bequests to his son, James Murry, of real estate.

4th contains bequests to his daughter, Nancy Cowen, of real estate.

5th contains bequests to his daughter, Elizabeth Dick, of real estate.

6th contains bequests to his daughter, Rebecca Gilchrist, of real estate.

7th contains devises to his daughter, Sarah Burrel, of real estate.

8th contains devises to his daughter, Jane Carpenter, of real estate.

9th, 10th, 11th, 12th, 13th, consist of devises to each of his grandsons who has been " *named for me,*" of real estate.

14th is a devise to his grandchild, John Murry, of real estate.

15th is a devise to his granddaughter, Satiah Carpenter, of real estate.

16th consists of devises to his grandchildren indiscriminately, "*who have no land bequeathed by this will.*"

17th provides for the rents of lands, devised to his grandchildren, being received by their parents or guardians, for the use of the devisees.

18th contains a disposition of his personal estate, which is enumerated.

19th is a provision, as to funds that may remain after the death or marriage of his widow.

20th provides for the purchase of mourning for each of his daughters, his widow and his daughter-in-law.

21st consists of a disposition of various articles, such as a likeness, a clock, a watch, the payment of 25 dollars as the yearly rent of a pew in the church, and other things.

All the devises are expressed with proper and apt words of grant and limitation, as thus, in the devise to his grandson, Jeremiah Murry, it is declared " to be possessed and holden by him, his heirs and assigns forever, but should the aforesaid Jeremiah Murry, Jun., die before he arrives at the age of twenty-one, or die without lawful male issue, then," &c.

So in the devise to James Murry, it is thus; " all of which I do will and bequeath to the said James Murry, and to his heirs and assigns forever;" and so of the others.

Near the close of the paper, there is this clause: "and it is my will, that as soon as three or four of the said children, are of the

[Murry v. Murry.]

age of twenty-one, that a tract or more of the above land, may be sold *by my executors hereafter named,* and payment made to the different heirs, as they severally arrive at the age of twenty-one, leaving to the decision of my executor, the time and manner of sale, &c.; and I hereby authorize my executors to execute a good, legal and sufficient title to the purchasers, &c."

This paper is not dated, nor signed, nor is there any witness. It was proved to be all in the handwriting of the decedent, and that he was, and continued until the time of his death, of a sound and disposing mind and memory.

Several witnesses were examined, and written leases produced in court, showing that the writing must have been drawn up before the year 1833.

It was also proved, that the decedent spoke of several of the pieces of property described in said writing, and stated that they belonged to the persons respectively named as the devisees thereof, saying that he had made his will and would not alter it.

It was also shown, that the said decedent had disposed of all his property by said writing, and that the persons named therein as his children, were all the children he had.

The said Jeremiah Murry died in the month of September 1835.

Mrs. Rebecca Gilchrist, the daughter named in said writing, died in the summer of 1835.

The precept from the register exhibits, also, another instrument in the handwriting of the decedent, consisting of seven pages without date, and not differing essentially from the former one, except that the devise to Rebecca Gilchrist is made to her heirs, so that it must have been written after her death in 1835; that paper was not read in evidence on the trial.

On the first trial of the cause, a verdict was rendered for the plaintiffs which was set aside, and on a second trial the defendant's counsel demurred to the evidence; plaintiffs joined in demurrer, and the court (White, president) rendered a judgment for the defendant, and this writ of error was sued out.

The assignment of error is, that it appears by the record, judgment was given for the defendant, whereas, judgment ought to have been given for the plaintiffs.

*Alexander*, for plaintiff in error, cited 1 *Dall.* 94; 7 *Bac. Abr.* 311; 3 *Lev.* 1; 8 *Viner* 122; *Stark. Ev.* 1683; 7 *Bac. Abr.* 340; 1 *Shep. Touch.* 401; *Swinburne* 539; 2 *Show* 17; 2 *Mod.* 310; *Sir T. Jones* 108; 4 *Serg. & Rawle* 409; 7 *Johns.* 496; 3 *Call.* 278; *Prac. in Chan.* 77; 3 *Eg. Ca. Abr.* 760; 12 *Serg. & Rawle* 363; *Skin.* 227; 2 *Atk.* 36; 3 *Atk.* 551; *Amb.* 453.

*Coulter* and *Foster*, contra, cited *Roberts on Wills* 200; 3 *Rawle* 40; 1 *Pr. Wms.* 771; 1 *Vez. Jun.* 351; *Amb.* 451; 4 *M'Cord* 39; *Story's Con. of Laws* 398.

[Murry v. Murry.]

The opinion of the Court was delivered by

GIBSON, C. J.—As a statute has prescribed a particular badge of testamentary authenticity since the paper in contest was written, the decision now to be made, must be of limited application as a precedent; and I shall do no more than mark the principles on which it is rested. The earlier decisions certainly gave to almost every imperfect scrap of paper written in contemplation of death, the efficacy of a testamentary disposition; but the courts have, in a great measure, retraced their steps, and the result of the authorities collected in Roberts on Wills, ch. 1, sect. 17, is, that the writer must have intended the paper to operate as it stood, without a further act to complete it; and that this must appear from the paper itself. In Matthews *v.* Warner, 4 *Ves.* 209, Lord Rosslyn carried the principle to its extreme limit in repudiating a will, subscribed and dated, with a codicil annexed, because the testator called it a *plan* of his will *proposed* to be drawn. A testamentary intention, however, is to be inferred from every prospective disposition where no particular expression, or apparent want of completion, indicates a suspension of it. On these principles depend Griffin *v.* Griffin, 4 *Ves.* 197, (note) Coles *v.* Trecothic, 9 *Ves.* 249, and Barnet's Appeal, 3 *Rawle* 15. Now a most potent indication of suspended intention, and in the absence of formal execution, a conclusive proof that the paper was not designed to operate as it stood, is a failure to provide for something declared to be a subject of intended provision. Does the paper exhibit such a failure here? After devises of lands to children and grandchildren, the writer provides for others by legacies raised from lands to be sold, as he expresses it, " by my executors *hereafter named;*" yet he proceeds not so far as to name any. Could any thing more distinctly evince the suspension of an intent to declare his whole counsel? That it was a part of his scheme to provide for the execution of his will by his own agents, we have his own assertion; yet the intended provision remains unsupplied, and the deficiency is attributable to nothing, but a suspension of his purpose. Nor were the functions of those agents to be trivial or unimportant. They were to be discretionary in determining the time and manner of the sale and payments; in putting out a fund for the maintenance of the widow; and in applying the principal, should the interest fall short. Who will assert that he would have consented to let the paper take effect on any other condition? By declaring a present intent to appoint those who were in his confidence, he declared it to be his intent not to trust to appointment by the law; and we must infer that executors would have been nominated, had his plan been carried out. The importance of a testamentary delegation of fiduciary power, was highly appreciated in the earlier periods. " The naming or appointing an executor," says Swinburne, Pt. 1, s. 3, pl. 11, " is said to be the foundation, the substance, the head, and is indeed the true formal cause of the testament; without which, a will is no

proper testament, and by which only the will is made a testament." So, also, says Godolphin, Pt. 1, ch. 1, s. 2, " the appointment of an executor is the very foundation of the testament; whereof the nomination of an executor and the *justa voluntas* of the testator, are the two main essentials;" and in Woodward *v.* Darcy, *Plowd.* 185, the judges held that, "without an executor the will is void." I pretend not to say it would have been so here, had not executorship been propounded as a part of the decedent's plan; but the stress laid upon it, shows it to be a matter of substance, even by the mitigated principles of our day. His will has consequently not been expressed. Had there been a formal execution and publication of it, the omission might have been referred to a change of purpose; but the parol evidence of his declarations that he had already made his will, were they applicable only to the paper in question, would fall short of the effect, because the entireness of it as the frame-work of a will, must be judged of from itself. Even in cases where extrinsic declarations may operate, they must distinctly appertain to the particular paper, as was decided in Hock *v.* Hock, 6 *Serg. & Rawle* 47; and in that respect, the proof would be defective here, because the decedent may have written other wills. We are clear that the statute operates only on wills written subsequently; but under the law as it stood, the paper in contest is destitute of the necessary proof of authenticity.

　　Judgment affirmed.