## BOLING'S HEIRS *vs.* BOLING'S EXECUTOR.

1. A paper in the handwriting of the deceased, purporting to be his last will and testament, but without date, signature or attestation, cannot be admitted to probate as a testament, upon proof that it was found among the decedent's papers after his death, and in connection with it a memorandum in his handwriting, containing a schedule of his debts and suggestions for the management of his estate; that the decedent was a lawyer, a cautious and prudent man, not disposed to communicate to people generally his views and plans for the management of his affairs, and not apt to change any views or opinions which he had deliberately reduced to writing; that he had approved of a similar will, made by his brother-in-law about two years previously; that the paper was written in May, and a few days afterwards decedent was taken sick and confined about two weeks, after which he partially recovered, and was able to attend to business for two or three weeks, when he relapsed, and after a confinement of sixteen days died, in a congestive chill, on the first of August; that the result of his case, in the opinion of his attending physician, was unexpected to him up to the time of the chill, and after that he was unable to attend to business.

ERROR to the Court of Probate of Lowndes.

J. B. STONE, for plaintiff in error.

J. P. SAFFOLD, *contra.*

PHELAN, J.—The following instrument, proven to be in the handwriting of the testator, was propounded in the Probate Court of the county of Lowndes, as a will of personal estate:

"The State of Alabama, ⎱    I, James M. Boling, of the Lowndes County. ⎰ county of Lowndes and State of Alabama, being now in good health, and of good and disposing mind and memory, but aware of the uncertainty of life, do make this as my last will and testament:

S. 1st. I give and bequeath to my dear and beloved wife, Mary A. Boling, all my estate, both real and personal, including all money and choses in action. This I do, because I have confidence that she will do justice to our dear children, and because I believe she will have it in her power the better to do them justice, and also to do justice to herself, by having control of all my property.

S. 2. I hereby appoint my affectionate wife, Mary A. Boling,

my executrix, desiring her to pay all my debts as soon as possible. Witness my hand and seal the      day of A. D. 1852.

Signed sealed and published in our presence, and in the presence of each other, and in the presence of testator, at his request, on the day this will bears date."                    $\{ L. S. \}$

The material facts further shown before the Probate Court were these:

1. The foregoing will was found among the papers of James M. Boling after his death, and in connection with it, a memorandum in his hand writing containing a full schedule of his debts, and of debts and demands due to him. This memorandum is dated 13th May, 1852. A settlement which he made with his sister, Mrs. Anderson, as she proved, on 24th May, 1852, is also noted in his hand writing on this memorandum. At the close of the memorandum is a very full and specific series of prudent suggestions as to the best manner of investing and managing his property, seemingly intended, not so much for his own guidance, as for the guidance of whoever might have the management of his estate after his death. The following extract will show the nature of these suggestions: "It will be observed, that I somewhat prefer a plantation and negroes to other investments. This I do, because I think property of this kind, if not the most profitable, or the most desirable to own, is as little liable to be wasted. It is hazardous to loan money, or to invest in stocks in this State, and unpleasant to hire negroes out; I can think of no investment so sure as a plantation and negroes."

2. The testator was first taken sick on the 12th June, 1852. Dysentery was prevailing about that time at Hayneville, his place of residence, to a fatal extent; and his mind had been apprehensive of sickness, before his attack. He was confined with his first attack about two weeks. He then partially recovered, and attended to business to some extent two or three weeks, when he relapsed, and after a confinement of sixteen days, died in a congestive chill, on the morning of 1st August. His symptoms, on the morning of the day be-

fore his death, indicated decided improvement; he said he felt better, and expressed his belief that he was getting well; but, about 4 o'clock of that day he had a congestive chill, of which he died in the course of twelve or fourteen hours. Dr. Cook, his attending physician, expresses the belief, that the result of his case was unexpected to him up to the time of the chill; and that after that time he was unable to attend to business.

3. The amount of his property is not accurately given, but the memorandum he made discloses that he owned two tracts of land, one containing 820 acres, the other 550 or 560 acres; a lot of 11 acres in Mobile; a house and lot (his family residence) in Hayneville; a law library that cost over $3000; some negroes, how many is not stated anywhere; and it appears that the debts and demands due to him would be about equal to his outstanding debts.

4. He left a wife and four young children; was a cautious, prudent man, not disposed to communicate his views and plans for the management of his affairs to people generally, and a man who was not apt to change any views or opinions which he had deliberately reduced to writing or communicated to others; had in conversation with his sister, Mrs. Anderson, about two years before, approved of a will similar in its provisions which her husband had made. From conversations with the testator, as to the liabilities of executors, &c., from the nature of this will, and his approval of her husband's will, this witness expresses the opinion that her brother, the testator, was of a settled opinion that it was best and wisest with small estates to leave them as he had done.

5. There is no proof that the testator, during his sickness, made any allusion to having made this will, or any will.

6. There is no proof, direct to the point, that Mr. Boling was a lawyer by profession; but we regard that as a fact proven when he says that his law library cost him over $3000.

The question now is, do all these facts and circumstances, taken together, go to prove that the instrument of writing propounded as a will of personal property, was a will to that extent, or a will in any sense.

What makes a will? It is the *animus disponendi*—the settled intention of a man to pass his property in a certain

way after his death.   This ought in every case satisfactorily to appear, or there is no will.

Does this satisfactorily appear in the present case?   Yes, it is argued, he wrote out this instrument with his own hand carefully; and at or about the same time carefully prepared a statement of his debts and money due him; and a memorandum of the best plan for managing his estate after his decease; he approved of this manner of disposing of an estate, not large, to his sister; was a man not inclined to change plans, or opinions deliberately formed.

But he was a prudent, cautious man; besides, he was a lawyer, who well understood how such things should be done, to make them binding in law; and these facts make a strong impression, that, although he meditated doing so, at some future time, and was putting things in train for making a will, he did not intend this unfinished paper as a will; that the final action, the settled purpose of mind to pass his property, did not then exist.

It may be answered again: But he fully approved such a mode of disposing of an estate, not larger than his, as shown in his conversations with his sister.   No; not of disposing of part of his estate, the personal property only, as this would be, and as he must know it would be.   What he approved of, was such a disposition of the entire estate, real and personal. And it is, in fact, an argument against the validity of this instrument for any purpose, that such a disposition of property as it made, was only approved by the testator when it carried the whole estate; that he, as a lawyer, must well know that if the paper in its unfinished state was good for any purpose, it would only be so as to part of his property, and that, therefore, he did not intend it to have any validity whatever, until made complete by his signature, and the attestation of the requisite number of witnesses to carry the real, as well as the personal estate.

It may be further argued, that, being a lawyer, he must intend the necessary legal consequences of his acts; that at the common law, which is in force in this State, numerous precedents are to be found, where, if a man writes out his will with his own hand, or even directs another to write it for him, the same will be a good will of personal property, with-

out being signed at the close by the testator, or witnessed.

It is fair, we concede, to suppose that, being a lawyer, he understood the rule of law which governed so important a transaction, and that he intended to shape his conduct by it. What is the rule of law, then, which governs the case?

Here it is: "The presumption is always against a paper which bears self-evident marks of being unfinished; and it behooves those who assert its testamentary character distinctly to show, either that the deceased intended the paper in its actual condition to operate as his will, or that he was prevented by involuntary accident from completing it." 1 Jarman on Wills 138, and authorities there cited. See also Jones v. Kea, 3. Dev. 301; 6 Watts 353; 4 Hagg. 380; Waller v. Waller, 1 Grattan 454; 4 Har. & J. 156.

Mr. Boling wrote out a will intended to convey his whole estate, and intended to be signed and attested. He did not sign it, and it was never attested. Was there any obstacle to his having it signed and attested, sufficient to account for these omissions, and leave room to suppose that he meant it as a will in that shape? None, that deserve to be so considered. It was several days after writing it out before he was first taken sick, and he recovered from his first attack so far as to attend to business in some degree for two or three weeks, before the last and fatal attack. The presumption against it, then, arising from incompleteness, is not removed by showing that it could not have been easily or conveniently made complete.

Is the presumption against it rebutted, by showing that the testator intended it to stand as his will in that shape? Although he is proven to have written it in May, and did not die until 1st August, we do not hear from him one word about this will which he had written out, and made ready to be signed and attested. Had he regarded it in the light of a will, he must, it would seem, have spoken of it as such. Though strongly inclined to bestow confidingly upon his wife his whole property, and leave his children to her maternal affection, as we must believe from the facts, we cannot resist the conviction that his mind never came to the full and settled determination to take that course. The law, whose provisions all must admit to be essentially safe and equitable,

will consequently have to make the final disposition of his property.

Under the facts of the case, we think that the Probate Court erred in admitting this paper to probate as a will; its order and decree to that effect are consequently reversed, and the case is remanded, that an order may be made refusing to admit the same to probate as a will to any extent whatever.